KAREN P. HEWITT
United States Attorney
CHRISTOPHER M. ALEXANDER
Assistant U.S. Attorney
California Bar. No. 201352
Federal Office Building
880 Front Street, Room 6293
San Diego, California  92101-8893
Telephone: (619) 557-7425 /(619) 235-2757 (Fax)
Email: Christopher.M.Alexander@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | ) | Criminal Case No. 07CR3470-BEN |
|---|---|---|
| Plaintiff, | ) | HEARING DATE:    February 25, 2008<br>TIME:                      2:00 p.m. |
| v. | ) | UNITED STATES' RESPONSE TO<br>DEFENDANT'S MOTIONS: |
| JULIO BELTRAN-LAY, | ) | (1)    COMPEL DISCOVERY/PRESERVE<br>EVIDENCE; |
| Defendant. | ) | (2)    SUPPRESS FRUITS OF UNLAWFUL<br>STOP;<br>(3)    SUPPRESS FIELD STATEMENTS;<br>(4)    SUPPRESS DEPORTATION TAPE;<br>(5)    DISMISS DUE TO FAILURE TO<br>ALLEGE ALL ELEMENTS;<br>(6)    DISMISS DUE TO FAILURE TO<br>PRESENT;<br>(7)    DISMISS DUE TO GRAND JURY<br>INSTRUCTIONS;<br>(8)    STRIKE SURPLUSAGE; AND<br>(9)    FOR LEAVE TO FILE FURTHER<br>MOTIONS. |
| | ) | |
| | ) | TOGETHER WITH STATEMENT OF FACTS,<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES |

1    COMES NOW the plaintiff, the UNITED STATES OF AMERICA, by and through its counsel,

2    KAREN P. HEWITT, United States Attorney, and Christopher M. Alexander, Assistant United States

3    Attorney, and hereby files its Response and Opposition to Defendants' above-referenced motions. This

4    Response and Opposition is based upon the files and records of the case together with the attached

5    statement of facts and memorandum of points and authorities.

6    **I**

7    **STATEMENT OF THE CASE**

8    On December 27, 2007, a federal grand jury in the Southern District of California returned an

9    Indictment charging Defendant Julio Beltran-Lay ("Defendant") with being a deported alien found in

10   the United States after deportation in violation of 8 U.S.C. § 1326. On January 8, 2008, Defendant was

11   arraigned and entered a not guilty plea. The Court set a motion hearing date for February 25, 2008.

12   On February 11, 2008, Defendant filed motions to compel discovery, suppress various evidence,

13   dismiss the indictment on various grounds, strike the date allegation in the Indictment as surplusage, and

14   for leave to file further motions. The United States now responds.

15   **II**

16   **STATEMENT OF FACTS**

17   A.    **The Instant Offense**

18   On Monday, October 22, 2007, at approximately 5:15 a.m., Sector Radio broadcasted a citizen's

19   report of an individual detained near the R.J. Donovan Correctional Facility. The prison is located

20   approximately one mile east of the Otay Mesa, Port of Entry and approximately two miles north of the

21   international border with Mexico. Border Patrol Agent Edgar Hunt responded to the call.

22   When Agent Hunt arrived, Correctional Officer Sergeant J. Averett had Defendant detained

23   approximately 200 yards east of the guard shack. Sergeant Averett stated that he stopped Defendant

24   because he was trespassing and thought he might be an inmate trying to escape from the facility. After

25   a brief interview, Sergeant Averett determined that Defendant was not an inmate.

26   Agent Hunt approached Defendant, identified himself as a Border Patrol agent, and asked

27   Defendant routine immigration questions. Defendant claimed that he was a "United States citizen."

28   Defendant could not provide any identification to support his claim. Agent Hunt asked Defendant

common knowledge questions regarding the United States. Defendant was unable to provide accurate answers. The answers Defendant provided were confused and contradictory. Defendant was detained and transported to the Chula Vista Border Patrol stations for processing.

At the station, Defendant was entered into the Automated Biometric Identification System. This provided Defendant's true identity and some of his prior criminal and immigration histories. These checks indicated a formal order of removal by an Immigration Judge on October 10, 2007. Defendant's criminal history also showed a conviction for robbery. A complete set of rolled fingerprints was submitted to WIN/AFIS and confirmed Defendant's identity.

At approximately 10:19 a.m.,         Agent Hunt advised Defendant in the Spanish language of his communication rights with the Mexican Consulate as witnessed by Agent Juan Sanchez. Defendant stated that he understood this right and did not wish to speak with the consulate.

Defendant was also advised that his administrative rights did not apply and that he was being charged criminally. Furthermore, he was advised that a voluntary return to Mexico would not be granted.

At approximately 10:21 a.m., Agent Hunt advised Defendant in the Spanish language of his Miranda warnings as witnessed by Agent Sanchez. Defendant stated that he understood his rights and invoked his right to remain silent. At this time, all questioning stopped.

**B.    Defendant's Criminal and Immigration History**

Defendant was convicted on April 14, 2006, of robbery in violation of California Penal Code § 211 and received 2 years in prison.

Concerning his immigration history, on October 10, 2007, Defendant was ordered deported and was physically removed from the United States to Mexico.

**III**

**MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE**

The United States has and will continue to fully comply with its discovery obligations under Brady v. Maryland, 373 U.S. 83 (1963), the Jencks Act (19 U.S.C. § 3500), Rule 16 of the Federal Rules of Criminal Procedure, and Rule 26.2 of the Federal Rules of Criminal Procedure. The United States has already delivered 41 pages and one DVD of discovery to defense counsel including investigative

1    reports and Defendant's statements on October 22, 2007. Nevertheless, Defendant makes a series of

2    discovery requests. The following is the United States' response to Defendant's requests.

3         Initially, Defendant request additional discovery concerning the deportation tape, any statements

4    made by Defendant, and the Alien Registration File ("A-File") associated with Defendant. The United

5    States has requested any deportation tapes associated with Defendant and will produce them (if they

6    exist) when they arrive (despite it being equally available to Defendant). The United States has

7    produced Defendant's statement for his October 22, 2007 arrest. The United States will continue to

8    produce discovery related to Defendant's statements made in response to questions by agents.

9         Regarding the A-File request, the United States objects to this request. This information is

10   equally available to Defendant through a Freedom of Information Act request. Even if Defendant could

11   not ascertain the A-File through such a request, the A-File is not Rule 16 discoverable information. The

12   A-File contains information that is not discoverable like internal government documents and witness

13   statements. See Fed. R. Crim. P. 16(a). Witness statement would not be subject to production until after

14   the witness testifies and a motion is made by Defendant. See Fed. R. Crim. P. 26.2. Thus, the A-File

15   associated with Defendant need not be disclosed.

16        Defendant claims that the A-File must be disclosed because (1) it may be used in the United

17   States' case-in-chief; (2) it material to his defense; and (3) it was obtained from or belongs to him. The

18   United States will turn over documents it intends to use in its case-in-chief. Evidence is material under

19   Brady only if there is a reasonable probability that had it been disclosed to the defense, the result of the

20   proceeding would have been different. United States v. Antonakeas, 255 F.3d 714, 725 (9th Cir. 2001).

21   However, Defendant has not shown how documents in the A-File are material. Finally, Defendant does

22   not own the A-File. It is an agency record. Should the Court order disclosure of the A-File, the United

23   States will comply as it does in other cases.

24        1.    Statements of Defendant

25        The United States has already produced reports disclosing the substance of Defendant's oral and

26   written statements. The United States will continue to produce discovery related to Defendant's

27   statements made in response to questions by agents. Relevant oral statements of Defendant are included

28

3                                                              07CR3470-BEN

1    in the reports already provided. Agent rough notes, if any exist, will be preserved, but they will not be

2    produced as part of Rule 16 discovery.

3        A defendant is not entitled to rough notes because they are not "statements" within the meaning

4    of the Jencks Act unless they comprise both a substantially verbatim narrative of a witness' assertions

5    and they have been approved or adopted by the witness. United States v. Bobadilla-Lopez, 954 F.2d

6    519 (9th Cir. 1992); United States v. Spencer, 618 F.2d 605 (9th Cir. 1980); see also United States v.

7    Alvarez, 86 F.3d 901, 906 (9th Cir. 1996); United States v. Griffin, 659 F.2d 932 (9th Cir. 1981).

8        2.    Arrest Reports and Notes

9        The United States has provided the Defendant with arrest reports. As noted previously, agent

10   rough notes, if any exist, will be preserved, but they will not be produced as part of Rule 16 discovery.

11   The United States is unaware of any dispatch tapes regarding Defendant's apprehension.

12       3.    Brady Material

13       Again, the United States is well aware of and will continue to perform its duty under Brady v.

14   Maryland, 373 U.S. 83 (1963) and United States v. Agurs, 427 U.S. 97 (1976) to disclose exculpatory

15   evidence within its possession that is material to the issue of guilt or punishment. Defendant, however,

16   is not entitled to all evidence known or believed to exist which is, or may be, favorable to the accused,

17   or which pertains to the credibility of the United States' case. As stated in United States v. Gardner, 611

18   F.2d 770 (9th Cir. 1980), it must be noted that:

19           [T]he prosecution does not have a constitutional duty to disclose every bit of information
             that might affect the jury's decision; it need only disclose information favorable to the
20           defense that meets the appropriate standard of materiality. [Citation omitted.]

21   Id. at 774-775.

22       The United States will turn over evidence within its possession which could be used to properly

23   impeach a witness who has been called to testify.

24       Although the United States will provide conviction records, if any, which could be used to

25   impeach a witness, the United States is under no obligation to turn over the criminal records of all

26   witnesses. United States v. Taylor, 542 F.2d 1023, 1026 (8th Cir. 1976). When disclosing such

27   information, disclosure need only extend to witnesses the United States intends to call in its case-in-

28

4                                                                                    07CR3470-BEN

1  chief.  United States v. Gering, 716 F.2d 615, 621 (9th Cir. 1983); United States v. Angelini, 607 F.2d

2  1305, 1309 (9th Cir. 1979).

3      Finally, the United States will continue to comply with its obligations pursuant to United States

4  v. Henthorn, 931 F.2d 29 (9th Cir. 1991).

5      4.    Sentencing Information

6      Defendant claims that the United States must disclose any information affecting Defendant's

7  sentencing guidelines because such information is discoverable under Brady v. Maryland, 373 U.S. 83

8  (1963).  The United States respectfully contends that it has no such disclosure obligation.

9      The United States is not obligated under Brady to furnish a defendant with information which

10 he already knows.  United States v. Taylor, 802 F.2d 1108, 1118 n.5 (9th Cir. 1986).  Brady is a rule of

11 disclosure, and therefore, there can be no violation of Brady if the evidence is already known to the

12 defendant.  In such case, the United States has not suppressed the evidence and consequently has no

13 Brady obligation.  See United States v. Gaggi, 811 F.2d 47, 59 (2d Cir. 1987).

14     But even assuming Defendant does not already possess the information about factors which

15 might affect his guideline range, the United States would not be required to provide information bearing

16 on Defendant's mitigation of punishment until after Defendant's conviction or plea of guilty and prior

17 to his sentencing date.  See United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir. 1988) ("No

18 [Brady] violation occurs if the evidence is disclosed to the defendant at a time when the disclosure

19 remains in value.").  Accordingly, Defendant's demand for this information is premature.

20     5.    Defendant's Prior Record

21     The United States has already provided Defendant with a copy of his criminal record in

22 accordance with Federal Rule of Criminal Procedure 16(a)(1)(D).

23     6.    Proposed 404(b) Evidence

24     Should the United States seek to introduce any similar act evidence pursuant to Federal Rules

25 of Evidence 404(b) or 609, the United States will provide Defendant with notice of its proposed use of

26 such evidence and information about such bad act at the time the United States' trial memorandum is

27 filed.  However, to avoid any arguments concerning lack of notice, the United States intends to introduce

28 Defendant's prior immigration contacts and robbery conviction as evidence of intent to enter the United

States, alienage, prior deportation, and lack of application for admission.  Moreover, Defendant's robbery conviction listed in the criminal history section above will be introduced to impeach him should he testify.

       7.    Evidence Seized

The United States has, and will continue to comply with Rule 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence which is within the possession, custody or control of the United States, and which is material to the preparation of Defendant's defense or are intended for use by the United States as evidence in chief at trial, or were obtained from or belong to Defendant, including photographs.

The United States, however, need not produce rebuttal evidence in advance of trial.  United States v. Givens, 767 F.2d 574, 584 (9th Cir. 1984), cert. denied, 474 U.S. 953 (1985).

       8.    Preservation of Evidence

The United States will preserve all evidence to which Defendant is entitled to pursuant to the relevant discovery rules.  However, the United States objects to Defendant's blanket request to preserve all physical evidence.  For example, Defendant requests preservation of narcotics.  What narcotics?

The United States has, and will continue to comply with Rule 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence which is within his possession, custody or control of the United States, and which is material to the preparation of Defendant's defense or are intended for use by the United States as evidence in chief at trial, or were obtained from or belong to Defendant, including photographs.  The United States has made the evidence available to Defendant and Defendant's investigators and will comply with any request for inspection.

       9.    Henthorn Material

The United States will review the personnel files of all federal law enforcement individuals who will be called as witnesses in this case for Brady material.  Pursuant to United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) and United States v. Cadet, 727 F.2d 1452 (9th Cir. 1984), the United States agrees to "disclose information favorable to the defense that meets the appropriate standard of materiality . . ." United States v. Cadet, 727 F.2d at 1467, 1468.  Further, if counsel for the United States

1    is uncertain about the materiality of the information within its possession in such personnel files, the

2    information will be submitted to the Court for <u>in camera</u> inspection and review.

3        10.    <u>Tangible Objects</u>

4        Again, the United States is well aware of and will fully perform its duty under <u>Brady v.</u>

5    <u>Maryland</u>, 373 U.S. 83 (1963) and <u>United States v. Agurs</u>, 427 U.S. 97 (1976), to disclose exculpatory

6    evidence within its possession that is material to the issue of guilt or punishment.  Defendant, however,

7    is not entitled to all documents known or believed to exist, which is, or may be, favorable to the accused,

8    or which pertains to the credibility of the United States' case.

9        The United States has, and will continue to comply with Rule 16(a)(1)(E) in allowing Defendant

10    an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence which is within

11    the possession, custody or control of the United States, and which is material to the preparation of

12    Defendant's defense or are intended for use by the United States as evidence in chief at trial, or were

13    obtained from or belong to Defendant, including photographs.

14        The United States, however, need not produce rebuttal evidence in advance of trial.

15    <u>United States v. Givens</u>, 767 F.2d 574, 584 (9th Cir. 1984), <u>cert</u>. <u>denied</u>, 474 U.S. 953 (1985).

16        11.    <u>Expert Witnesses</u>

17        Defendant requests written reports and summaries of any expert testimony pursuant to Federal

18    Rules of Criminal Procedure 16(a)(1)(G).  The United States will disclose to Defendant the name,

19    qualifications, and a written summary of testimony of any expert the United States intends to use during

20    its case-in-chief at trial pursuant to Fed. R. Evid. 702, 703, or 705.

21        At trial, the United States will offer the testimony of a Fingerprint Expert to establish

22    Defendant's identity and prior history.  The United States will provide a summary, and qualifications

23    of the expert when they are available.

24        Although not expected to give expert opinions based upon specialized knowledge, the United

25    States will also offer the testimony of a records custodian to introduce documents from Defendant's A-

26    File.  <u>See</u> Fed. R. Evid. 701 (such testimony is "helpful to a clear understanding of the determination

27    of a fact in issue"); <u>United States v. VonWillie</u>, 59 F.3d 922, 929 (9th Cir. 1995) (in a drug case, the

28    court found that "[t]hese observations are common enough and require such a limited amount of

expertise, if any, that they can, indeed, be deemed lay witness opinion"); United States v. Loyola-Dominguez, 125 F.3d 1315, 1317 (9th Cir. 1997) (agent "served as the conduit through which the government introduced documents from INS' Alien Registry File".).  This testimony will consist of explaining the purpose of the A-File, what documents are contained within the A-File, and the purpose of those documents.

12-13.  Impeachment and Evidence of Criminal Investigation

As stated previously, the United States will turn over evidence within its possession which could be used to properly impeach a witness who has been called to testify.

Although the United States will provide conviction records, if any, which could be used to impeach a witness, the United States is under no obligation to turn over the criminal records of all witnesses.  United States v. Taylor, 542 F.2d 1023, 1026 (8th Cir. 1976), cert. denied, 429 U.S. 1074 (1977).  When disclosing such information, disclosure need only extend to witnesses the United States intends to call in its case-in-chief.  United States v. Gering, 716 F.2d 615, 621 (9th Cir. 1983); United States v. Angelini, 607 F.2d 1305, 1309 (9th Cir. 1979).

14.     Bias or Motive to Lie

The United States is unaware of any evidence indicating that a prospective witness is biased or prejudiced against Defendant.  The United States is also unaware of any evidence that prospective witnesses have a motive to falsify or distort testimony.

15.     Evidence Affecting Perception

The United States is unaware of any evidence indicating that a prospective witness has a perception, recollection, communication, or truth telling problem.

16.     Witness Addresses

The United States will provide Defendant with a list of all witnesses which it intends to call in its case-in-chief at the time the United States' trial memorandum is filed, although delivery of such a list is not required.  See United States v. Dischner, 960 F.2d 870 (9th Cir. 1992); United States v. Culter, 806 F.2d 933, 936 (9th Cir. 1986); United States v. Mills, 810 F.2d 907, 910 (9th Cir. 1987).  Defendant, however, is not entitled to the production of addresses or phone numbers of possible witnesses of the United States.  See United States v. Hicks, 103 F.3d 837, 841 (9th Cir. 1996); United States v.

Thompson, 493 F.2d 305, 309 (9th Cir. 1977).  Defendant has already received access to the names of potential witnesses in this case in the investigative reports previously provided to him.

17.     Witnesses Favorable to Defendant

The United States is not aware of any witness who made a favorable statement concerning Defendant.

18.     Statements Favorable to Defendant

The United States is not aware of any witness who made a favorable statement concerning Defendant.

19.     Jencks Act Material

As stated previously, the United States will comply with its obligations pursuant to Brady v. Maryland, 373 U.S.  83 (1963), United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991), and the Jencks Act.

20.     Giglio Information

As stated previously, the United States will comply with its obligations pursuant to Brady v. Maryland, 373 U.S.  83 (1963), the Jencks Act, United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991), and Giglio v. United States, 405 U.S. 150 (1972).

21.     Agreements Between the United States and Witnesses

The United States is unaware of any agreements between the United States and any witness who may testify.

22-23.  Informants and Cooperating Witnesses

Defendant incorrectly asserts that Roviaro v. United States, 353 U.S. 52 (1957), establishes a per se rule that the United States must disclose the identity and location of confidential informants used in a case.  Rather, the United States Supreme Court held that disclosure of an informer's identity is required only where disclosure would be relevant to the defense or is essential to a fair determination of a cause.  Id. at 60-61.  Moreover, in United States v. Jones, 612 F.2d 453 (9th Cir. 1979), the Ninth Circuit held:

> The trial court correctly ruled that the defense had no right to pretrial discovery of information regarding informants and prospective government witnesses under the Federal Rules of Criminal Procedure, the Jencks Act, 18 U.S.C. § 3500, or Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

1  Id. at 454.  As such, the United States is not obligated to make such a disclosure, if there is in fact

2  anything to disclosure, at this point in the case.

3        That being said, the United States is unaware of the existence of an informant in this case.

4  However, as previously stated, the United States will provide Defendant with a list of all witnesses

5  which it intends to call in its case-in-chief at the time the United States' trial memorandum is filed,

6  although delivery of such a list is not required.  See United States v. Dischner, 960 F.2d 870 (9th Cir.

7  1992); United States v. Culter, 806 F.2d 933, 936 (9th Cir. 1986); United States v. Mills, 810 F.2d 907,

8  910 (9th Cir. 1987).  Defendant, however, is not entitled to the production of addresses or phone

9  numbers of possible witnesses of the United States.  See United States v. Hicks, 103 F.3d 837, 841 (9th

10  Cir. 1996); United States v. Thompson, 493 F.2d 305, 309 (9th Cir. 1977).  Defendant has already

11  received access to the names of potential witnesses in this case in the investigative reports previously

12  provided to him.

13        24.    Personnel Records of Officers Involved in the Arrest

14        The United States objects to this request.  Defendant has not shown how any personnel records

15  of the arresting officers are relevant to this case.  Defense counsel has no constitutional right to conduct

16  a search of agency files to argue relevance.  See Pennsylvania v. Ritchie, 480 U.S. 39, 59-60 (1987)

17  (citing Weatherford v. Bursey, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to

18  discovery in a criminal case, and Brady did not create one")).  Thus, the United States will review these

19  records for impeachment information, but will not provide these records as Rule 16 discovery.

20        To support his request, Defendant cites Pitchess v. Superior Court, 11 Cal.3d 531, 539 (1974).

21  In Pitchess, the California Supreme Court was addressing California Evidence Codes which permit the

22  disclosure of public entity personnel records provided that certain requirements are followed.  Id.

23  However, no such code exists under the Federal Rules of Evidence.

24        25.    The A-File

25        As addressed previously, the United States objects.  However, the United States will make the

26  A-File available if ordered to do so.

27

28

10                                                                                    07CR3470-BEN

26.    Reports of Scientific Tests or Examinations

The United States will comply with its obligations pursuant to Rule 16. At trial, the United States intends to offer testimony of a fingerprint expert to identify Defendant as the person who was previously deported. The United States will provide the qualifications of the experts, if any. The United States will provide a summary of his report when it is available.

27.    Residual Requests

The United States objects to this request. The United States has and will continue to comply with its discovery obligations.

**IV**

**DEFENDANT'S STATEMENTS AND ANY OTHER "FRUIT"
SHOULD NOT BE SUPPRESSED**

Defendant claims that the fruit of his arrest should be suppressed because his arrest was illegal. However, Defendant was not subjected to an illegal arrest. First, Defendant was not in custody when Agent Hunt was questioning him about his citizenship and legal right to be in the United States. Second, Sergeant Averett and Agent Hunt had reasonable suspicion to stop Defendant. Third, in addition to trespassing, Defendant's other violations of law provided probable cause to arrest him. Finally, assuming Defendant's stop was illegal, the Court cannot suppress his identity.

A.    **Defendant was Not in Custody During the Initial Questioning**

Defendant argues that he was in custody when told to stop. However, it is well settled that a law enforcement officer, like anyone else, may approach another person in a public place and ask questions. "[T]he Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate." Florida v. Bostick, 501 U.S. 429, 431 (1991). This rule "applies equally" to police encounters that take place on trains, planes, buses, and "city streets." Id. at 438, 439-40.

The fact that the law enforcement officer identifies himself as such does not convert the encounter into a seizure. Florida v. Royer, 460 U.S. 491, 497-98 (1983). Nor does the fact that he wears a gun or uniform or displays a badge. United States v. Drayton, 536 U.S. 194, 204-205 (2002); Bostick,

1   501 U.S. at 432.  The person approached may decline to talk, may choose to leave, Royer, 460 U.S. at

2   497-98, or may "disregard the police and go about his business." California v. Hodari D., 499 U.S. 621,

3   626-67 (1991).  A person is not "seized" under the Fourth Amendment unless, under all the

4   circumstances, a reasonable (innocent) person would have believed that he was not free to leave. United

5   States v. Mendenhall, 446 U.S. 544, 554 (1980).  If there is no detention, there is no seizure, no need

6   for reasonable suspicion, and no Fourth Amendment violation.  Royer, 460 U.S. at 497-98; Terry v.

7   Ohio, 392 U.S. 1, 19, n.16 (1968).  The Supreme Court has applied this rule in a "long, unbroken line

8   of decisions dating back more than 20 years." Bostick, 501 U.S. at 439.

9              1.      Supreme Court Authority on Consensual Encounters

10  This "long, unbroken line of decisions" controls this case and compels the conclusion that there

11  was no seizure here.  The following Supreme Court cases examine consensual public encounters on

12  buses, in the workplace, in airports, or on the street and hold that there is no seizure where there is no

13  physical stop, no detention, and no coercion.

14  In Immigration and Naturalization Service v. Delgado, 466 U.S. 210 ( 1984), the Supreme Court

15  held there was no seizure when Immigration and Naturalization Service ("INS") agents visited factories

16  and questioned employees to determine whether they were illegal aliens.  Id. at 211-12.  During the

17  encounter, several agents positioned themselves near the building exits, while other agents--with badges,

18  walkie-talkies and guns-- moved throughout the factory and questioned the workers. Id.  If the worker

19  gave a credible reply that he was a United States citizen, the questioning ended.  If the worker gave an

20  unsatisfactory response, the agent asked further questions.  Id. at 212-13.

21  Noting that the Fourth Amendment "does not proscribe all contact between the police and

22  citizens," only "arbitrary and oppressive interference," id. at 215, the Court said that "police

23  questioning, by itself, is unlikely to result in a Fourth Amendment violation." Id. at 216.  The fact that

24  "most citizens will respond to a police request . . . and do so without being told they are free not to

25  respond, hardly eliminates the consensual nature of the response."  Id. (citing Schneckloth v.

26  Bustamonte, 412 U.S. 218 ( 1973)).

27

28

1   In <u>Mendenhall</u>, 446 U.S. 544, a plurality of the Supreme Court first discussed whether

2   Mendenhall was "seized" when approached by Drug Enforcement agents at the airport and asked

3   questions.[1]  As stated by the Court:

4   "[o]bviously, not all personal intercourse between policemen and citizens involves
    'seizures' of persons.  Only when the officer, by means of physical force or show of
5   authority, has in some way restrained the liberty of a citizen may we conclude that a
    'seizure' has occurred."

6

7   <u>Id.</u> at 552 (quoting <u>Terry</u>, 392 U.S. at 19, n.16).  The Court then discussed the "seizure" in <u>Terry</u>, where

8   the police officer grabbed Terry, spun him around, and patted down his clothing, while noting that

9   apparently no seizure had taken place before Terry was grabbed.  <u>Id.</u> at 553-54.

10   The Court in <u>Mendenhall</u> also discussed <u>Brown v. Texas</u>, 443 U.S. 47, 49 (1979), noting that

11   Brown was not "seized" when approached by two police officers in an alley, asked to identify himself,

12   and asked to explain why he was there.  <u>Mendenhall</u>, 446 U.S. at 556.  But after Brown refused to

13   identify himself and angrily told the officers that they had no right to stop him or question him, the

14   officers frisked him and arrested him for refusing to give his name when "lawfully stopped."  <u>Id.</u>  There

15   was a seizure at this point.

16                    2.    <u>Ninth Circuit Case Law on Consensual Encounters</u>

17   Relying on the Supreme Court cases discussed above, the Ninth Circuit has similarly held that

18   police encounters in airports and on the street and highway do not constitute seizures without

19   Government coercion.  In <u>United States v. Kim</u>, 25 F.3d 1426 (9th Cir. 1994), this Court stated that

20   "[a]bsent indicia of force or aggression, a request for identification or information is not a seizure or

21   investigatory stop."  <u>Id.</u> at 1430.  The Ninth Circuit held that there was no stop or seizure when two

22

23

24

25

26

27   [1]This part of the opinion was written by Justice Stewart and joined by Justice Rehnquist.  Chief
    Justice Burger, Justice Blackmun, and Justice Powell concurred in the judgment, while noting that
28   "(they) did not necessarily disagree with the views expressed in Part II-A" (on the initial seizure issue),
    but the question was "extremely close" given that Mendenhall produced her license and airline ticket.
    <u>Id.</u> at 560 n.1.

                                                    13                                        07CR3470-BEN

police officers asked the occupants to get out of their parked car,[2] separated them for questioning, and the officers' car partially blocked Kim's vehicle. Id. at 1428-36.[3]

Similarly, in United States v. Woods, 720 F.2d 1022 (9th Cir. 1983), Deputy Lundsford, accompanied by two other police officers, walked up to Woods and Goldstein, in the cocktail lounge of an airport. Deputy Lundsford identified themselves as police officers, told them they were investigating a possible narcotics transaction, asked for identification, and asked them some questions. Id. at 1025. Relying on Florida v. Royer, 460 U.S. 491 (1983), the Ninth Circuit went on to hold that the statements were voluntary responses to permissible and limited questions prior to any physical detention of seizure of their persons, and therefore the Fourth Amendment was not violated. Id. at 1026. Finally, the fact that the officers may have detained them if they tried to leave was irrelevant. Id.

### 3.    Defendant was Not Seized

Defendant's motion states that Sergeant Averett and Agent Hunt's request that Defendant stop was a seizure. Defendant has filed no declaration supporting this motion. Nothing in the report indicates that Defendant's encounter with either Sergeant Averett or Agent Hunt was anything but consensual.

Under the applicable Supreme Court and Ninth Circuit authority, Defendant was not seized. Police questioning, by itself, is unlikely to result in a Fourth Amendment violation. Delgado, 466 U.S. at 216. The Fourth Amendment permits police officers to approach persons in public places to ask them questions. Bostick, 501 U.S. at 431. Absent force or coercion, requesting information is not a seizure. Kim, 25 F.3d at 1430.

Defendant was not stopped or detained, and no force or coercion was used in questioning him. For these reasons, there was no "seizure" under the Fourth Amendment and no need for probable cause.[4]

---

[2]Relying on Mendenhall, 446 U.S. at 556-57, this Court noted that stopping car occupants for questioning typically involves a greater degree of intrusiveness than questioning of pedestrians and thus more readily impinges on the Fourth Amendment. Id. at 1430.

[3]Even if the agent's car had "more completely blocked" Kim's car, there would be no seizure, because Kim could have walked away. Id. at 1431 n.2.

[4]Since there was no seizure or detention, it follows a fortiori that there was no custody requiring the Miranda advisement. Similarly, 18 U.S.C. § 3501 does not apply unless there was an arrest (or detention). United States v. Poschwatta, 829 F.2d 1477, 1481-82 (9th Cir. 1987) (overruled on other grounds in Cheek v. United States, 498 U.S. 192 (1991)). In any event, Defendant's statements were

14

**B.    There Was Reasonable Suspicion for the Stop**

Second, even if he was stopped, an investigatory detention, a brief seizure by police based on reasonable suspicion of criminal activity, is an exception to the probable cause requirement of the Fourth Amendment. See Terry v. Ohio, 392 U.S. 1, 26 (1968). In Terry, the Supreme Court held that an officer may briefly stop an individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-down frisk for weapons. See id. at 22-24. Under the Terry principle, law enforcement officers may initiate an investigatory detention only if they have reasonable, articulable suspicion of criminal activity. See id. Evaluation of this standard occurs on a case-by-case basis, with the Court considering the "totality of the circumstances" that surround an encounter. See United States v. Arvizu, 534 U.S. 266, 275-77 (2002) ("the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot,'"); United States v. Cortez, 449 U.S. 411, 417 (1981).[5/]

"Behavior may be relevant, as . . . obvious attempts to evade officers can support a reasonable suspicion." United States v. Cervantes-Flores, 421 F.3d 825, 830 (9th Cir. 2005) (per curiam) (citing United States v. Brignoni-Ponce, 422 U.S. 873, 884-85 (1975)).

Once reasonable suspicion exists, it is permissible for law enforcement to detain a person in order to resolve questions about his or her identity. See United States v. Christian, 356 F.3d 1103, 1106 (9th Cir. 2004) (upholding a Terry stop to determine a suspect's identity by stating "nothing in our case law prohibits officers from asking for, or even demanding, a suspect's identification.").

Here, reasonable suspicion existed to justify the stop. Defendant was trespassing near a prison. Defendant could have been trying to (1) escape if he was an inmate; (2) to free an inmate; (3) smuggle contraband into the prison or the United States; or (4) enter the country illegally. The prison is not in a populated area. The prison is in close proximity to the international border. Defendant did not have valid identification. Since Sergeant Averett determined that Defendant was not an inmate, Border Patrol was contacted for assistance. Agent Hunt arrived and gathered biographical information. Defendant

voluntary and there was no "police overreaching." Colorado v. Connelly, 479 U.S. 157, 170 ( 1986).

[5/]"[T]he likelihood of criminal activity need not rise to the level required for probable cause." Arvizu, 534 U.S. 274.

responded that he was a United States citizen, but could not answer other immigration questions. At this point, there was probable cause, not just reasonable suspicion.

### C.    There Was Probable Cause to Arrest Defendant

There was also probably cause to arrest Defendant based upon the facts above. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." See People v. McKay, 27 Cal.4th 601, 614 (2002). Regarding his detention by Sergeant Averett, there was probable cause to arrest Defendant based upon trespassing. See Cal. Pen. Code § 602 (West 2007); People v. Birks, 19 Cal. 4th 108, 114 (1998) (defining the crime of trespassing).

In addition to trespassing, Sergeant Averett could have arrested Defendant for disorderly conduct by staying in a public place without permission. See Cal. Pen. Code § 647(e) (West 2007); but see Kolender v. Lawson, 461 U.S. 352, 360 (1983) (interpreting former Cal. Pen. Code § 647(e) as over broad). Sergeant Averett could have arrested Defendant for delaying a peace officer by being on prison grounds and providing no identification. See Cal. Pen. Code § 148(a) (West 2007); see Hiibel v. Sixth Judicial Dist., 542 U.S. 177, 303 (2004) (stating that "[a] state law requiring a suspect to disclose his name [or else face arrest]. . . is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures."); cf. People v. McKay, 27 Cal.4th 601, 607-619 (2002) (holding under Cal. Veh. Code § 40302, a person may be arrested if the person fails to present identification).

Regarding his detention by Agent Hunt, there was probable cause to arrest based upon the following charges: (1) false statement to a federal officer in violation of 18 U.S.C. § 1001; (2) illegal entry in violation of 8 U.S.C. § 1325; or (3) false claim to United States citizenship in violation of 18 U.S.C. § 911.

### D.    Defendant's Identity Cannot Be Suppressed Even If the Stop Was Illegal

For the reasons stated above, Defendant was not improperly arrested. Even if the Court disagrees, and suppresses Defendant's statements, his identity or "body" should not be suppressed because Defendant's fingerprints were taken ascertain his identity.

The Supreme Court has held that "the 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is

1   conceded that an unlawful arrest, search, or interrogation occurred." <u>INS v. Lopez-Mendoza</u>, 468 U.S.

2   1032, 1039, 1044 (1984); <u>see also</u> <u>United States v. Del Toro Gudino</u>, 376 F.3d 997, 1001 (9th Cir. 2004)

3   (holding that "the simple fact of who a defendant is cannot be excluded, regardless of the nature of the

4   violation leading to his identity"); <u>United States v. Orozco-Rico</u>, 589 F.2d 433, 435 (9th Cir. 1978)

5   (holding, in a § 1326 case, that "there is no sanction to be applied when an illegal arrest only leads to

6   discovery of the man's identity and that merely leads to the official file or other independent

7   evidence."). Thus, Defendant's motion to suppress fruit of his unlawful arrest should be denied.

8   **V**

9   **DEFENDANT'S MOTION TO SUPPRESS STATEMENTS SHOULD BE DENIED**

10  Defendant moves to suppress his statements. Defendant argues that his field statements should

11  be suppressed because he was in custody.

12  **A.    Defendant's Motion Should Be Denied Without a Hearing**

13  The Court should deny Defendant's motion to suppress without a hearing. Under Ninth Circuit

14  and Southern District Local Criminal Rule 47.1(g)(1)-(4), a defendant is entitled to an evidentiary

15  hearing on a motion to suppress only when the defendant adduces specific facts sufficient to require the

16  granting of Defendant's motion. <u>United States v. Batiste</u>, 868 F.2d 1089, 1093 (9th Cir. 1989) (where

17  "defendant, in his motion to suppress, failed to dispute any material fact in the government's proffer,

18  . . . . the district court was not required to hold an evidentiary hearing").

19  Here, in clear opposition to Local Rule 47.1(g), Defendant has failed to attach a declaration

20  creating an issue of fact regarding Defendant's field admission or post-arrest <u>Miranda</u> waiver. As such,

21  this Court should deny Defendant's motion to suppress, based on the Statement of Facts attached to the

22  Complaint in this case, that all of Defendant's statements were voluntarily made.

23  **B.    Defendant's Pre-arrest Statements Should Not Be Suppressed**

24  Defendant argues that his statements made prior to his arrest were made while in custody. In

25  <u>Miranda v. Arizona</u>, 396 U.S. 868 (1969), the Supreme Court held that under the Fourth Amendment

26  a person must be advised of his rights prior to incriminating questioning after custodial arrest.

27  Defendant's arguments are merit less for three reasons. First, Defendant was not in custody when he

28

17

1    was questioned.  Second, Defendant was not subjected to incriminating questioning while in custody.

2    Third, if Defendant was subjected to a stop, reasonable suspicion supported the stop.

3        First, to determine whether a person is in custody for purposes of <u>Miranda</u>, a court looks to the

4    circumstances surrounding the interrogation.  <u>United States v. Bravo</u>, 295 F.3d 1002 (9th Cir. 2002)

5    ("whether an invidividual in custody depends upon the objective circumstances of the situation, or

6    whether "'a reasonable innocent person . . . would conclude that after brief questioning he or she would

7    not be free to leave.'"").  Since Defendant was not in custody during his initial questioning, there was

8    no need for <u>Miranda</u> warnings.

9        Second, detaining a person for routine border questioning is not custodial.  <u>See</u> <u>United States v.

10   Galindo-Gallegos</u>, 244 F.3d 728, 731 (9th Cir.), <u>modified by</u> 255 F.3d 1154 (9th Cir. 2001).  Consistent

11   with <u>Galindo-Gallegos</u>, Defendant was detained and asked immigration questions.  As such, there is no

12   <u>Miranda</u> violation.

13       Third, even if he was in custody, an investigatory detention, a brief seizure by police based on

14   reasonable suspicion of criminal activity, is an exception to the probable cause requirement of the Fourth

15   Amendment.  <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 26 (1968).

16       Here, as explained earlier, reasonable suspicion existed to justify the stop.  Agent Hunt

17   questioned Defendant as to his citizenship and his right to be in the country.  Defendant responded that

18   he was a United States citizen, but could not answer other immigration question.  <u>Pennsylvania v.

19   Muniz</u>, 496 U.S. 582, 601-04 (1990) (even if incriminating, answers elicited prior to <u>Miranda</u> warnings

20   during procedures "necessarily attendant to the police procedure [are] held by the court to be legitimate"

21   and admissible).  Following discovery of Defendant's illegal attempt to enter the United States at the

22   station, Agents timely advised Defendant that he was under arrest.  Defendant was also timely advised

23   of his <u>Miranda</u> warnings, which he invoked.  All statements prior to Defendant's arrest are admissible;

24   and this Court should deny the motion to suppress any statements made prior to arrest.

25   **C.    <u>Routine Booking Information</u>**

26       Finally, upon detaining Defendant, Officers and Agents asked Defendant routine booking

27   questions for the purpose of obtaining background biographical information for filling out a personal

28   history report and a booking slip.  The Supreme Court has held that routine booking questions

18                                    07CR3470-BEN

1  reasonably related to law enforcement record keeping concerns are not testimony and are therefore

2  outside the Fifth Amendment privilege that <u>Miranda</u> is designed to protect. <u>See</u> <u>Pennsylvania v. Muniz</u>,

3  496 U.S. 582, 600-602 (1990). "Routine gathering of background biographical data does not constitute

4  interrogation sufficient to trigger constitutional protections." <u>United States v. Perez</u>, 776 F.2d 797, 799

5  (9th Cir. 1985). Citing <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980), the Ninth Circuit has held that

6  pre-<u>Miranda</u> questions regarding "where and when" a defendant was born "are normal questions

7  'attendant to arrest and custody,' so <u>Miranda</u> is not implicated." <u>United States v. Arellano-Ochoa</u>, 461

8  F.3d 1142, 1146 (9th Cir. 2006) (allowing the defendant's statements where he was charged with being

9  a non-immigrant alien in possession of a firearm). Consistent with <u>Muniz</u> and <u>Perez</u>, the Ninth Circuit

10  has allowed police officers to testify in § 1326 prosecutions about a defendant's statements of alienage

11  taken during the booking process. <u>See</u> <u>United States v. Salgado</u>, 292 F.3d 1169, 1174 (9th Cir. 2002).

12  Defendant's responses to the Sergeant Averett and Agents' questions therefore should be admitted.

**VI**

**DEFENDANT'S MOTION TO SUPPRESS HIS DEPORTATION STATEMENT IS**

**FORECLOSED BY NINTH CIRCUIT PRECEDENT**

16      Defendant's motion to suppress based up an discovery violation is without merit. Assuming a

17  deportation tape exists, it will be produced. Defendant points to no prejudice warranting the extreme

18  remedy he seeks.

19      As for his request to have a voluntariness hearing, it should be denied. A similar challenge was

20  made in <u>United States v. Solano-Godines</u>, 120 F.3d 957, 961 (9th Cir. 1997). In <u>Solano-Godines</u>, two

21  years before the government brought criminal charges of illegal reentry after deportation, the defendant

22  appeared at a deportation hearing and made statements about his place of birth, citizenship, prior

23  convictions, and prior lawful deportations without having been given a <u>Miranda</u> warning. <u>Id.</u> The Ninth

24  Circuit held that the statements were not obtained in violation of <u>Miranda</u>. <u>Id.</u> at 960 ("Miranda

25  warnings are not required before questioning in the context of a civil deportation hearing . . . because

26  deportation proceedings are not criminal prosecutions, but are civil in nature."). Accordingly, any

27  request for a voluntariness hearing is without merit and should be denied.

28

# VII

## DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO ALLEGE ALL ELEMENTS
## IS WITHOUT MERIT

Defendant argues that the Indictment must be dismissed since it fails to allege either that Defendant has been previously removed subsequent to a conviction or the specific date of his prior removal.  For reasons stated in the case he cites, this argument is without merit.

In United States v. Salazar-Lopez, 506 F.3d 748, 752 (9th Cir. 2007), the Ninth Circuit held that Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), bars a defendant convicted under 8 U.S.C. § 1326 from having his statutory maximum sentence increased for prior convictions, unless the indictment alleges "the date of the removal, or at least the fact that Salazar-Lopez had been removed after his conviction."  Here, the Indictment alleges the fact that Defendant "was removed from the United States subsequent to April 14, 2006."  The date alleged establishes the temporal relationship that he was removed after his conviction in April of 2006.  Thus, no elements are missing.

# VIII

## DEFENDANT'S MOTION TO DISMISS DUE TO FAILURE TO PRESENT
## IS WITHOUT MERIT

Defendant challenges the Indictment arguing that the face of the Indictment does not indicate whether the grand jury considered all the facts supporting the deportation element or which (if any) deportation the United States presented to the grand jury.  Defendant begins by assuming that a deportation has the following elements: "(1) that a deportation proceeding occurred as the [the] defendant and as a result, [(2)] a warrant of deportation was issued and [(3)] executed by the removal of the defendant from the United States."  United States v. Castillo-Basa, 483 F.3d 890 (9th Cir. 2007). Defendant's first challenge rests on a flawed assumption.  The United States is not required to prove to a jury beyond a reasonable doubt the deportation process described in Castillo-Basa.  Rather, the United States need only show physical removal.  United States v. Zepeda-Martinez, 470 F.3d 909, 913 (9th Cir. 2006) ("[t]his warrant is sufficient alone to support a finding of removal beyond a reasonable doubt.").

Second, as noted previously, the Indictment alleges that Defendant "was removed from the United States subsequent to April 14, 2006."  The temporal relationship between Defendant's removal

and his conviction is satisfied by this allegation.  Thus, as recognized in <u>Salazar-Lopez</u>, the United States need not allege a specific date of deportation.  Accordingly, Defendant's challenge due to failure to present what is nonessential information to the grand jury should be denied.

## IX

## THE GRAND JURY WAS PROPERLY INSTRUCTED

Defendant makes two challenges contentions relating to instructions given to the grand jury during its impanelment by District Judge Larry A. Burns.  Although recognizing that the Ninth Circuit in <u>United States v. Navarro-Vargas</u>, 408 F.3d 1184 (9th Cir. 2005) (en banc) generally found the grand jury instructions constitutional, Defendant here contends Judge Burns went beyond the text of the approved instructions, and by so doing rendered them improper warranting dismissal of the Indictment.

In making his arguments concerning the instructions Defendant urges this Court to dismiss the Indictment on two separate bases relating to grand jury procedures, both of which were discussed in <u>United States v. Isgro</u>, 974 F.2d 1091 (9th Cir. 1992).  Concerning the first attacked instruction, Defendant urges this Court to dismiss the Indictment by exercising its supervising powers over grand jury procedures.  This is a practice the Supreme Court discourages as Defendant acknowledges, citing <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992) ("Given the grand jury's operational separateness from its constituting court, it should come as no surprise that we have been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure.").  <u>Isgro</u> reiterated:

> [A] district court may draw on its supervisory powers to dismiss an indictment. The supervisory powers doctrine "is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice."  <u>Before it may invoke this power, a court must first find that the defendant is actually prejudiced by the misconduct.</u> Absent such prejudice-that is, absent "'grave' doubt that the decision to indict was free from the substantial influence of [the misconduct]"-a dismissal is not warranted.

974 F.2d at 1094 (citation omitted, emphasis added).  Concerning the second attacked instruction, in an attempt to dodge the holding in <u>Williams</u>, Defendant appears to base his contentions on the Constitution as a reason to dismiss the Indictment.  Concerning that kind of a contention <u>Isgro</u> stated:

> [A] court may dismiss an indictment if it perceives constitutional error that interferes with the grand jury's independence and the integrity of the grand jury proceeding. "Constitutional error is found where the 'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant."  Constitutional error may also be found "if [the] defendant can show a history of prosecutorial misconduct that is so systematic and

pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed."

974 F.2d at 1094 (citation omitted).

The portions of the two relevant instructions approved in <u>Navarro-Vargas</u> were:

> You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal.   That is to be determined by Congress and not by you.

408 F.3d at 1187, 1202.

> The United States Attorney and his Assistant United States Attorneys will provide you with important service in helping you to find your way when confronted with complex legal problems.   It is entirely proper that you should receive this assistance. If past experience is any indication of what to expect in the future, then you can expect candor, honesty, and good faith in matters presented by the government attorneys.

408 F.3d at 1187, 1206.

Concerning the "wisdom of the criminal laws" instruction, the court stated it was constitutional because, among other things, "[i]f a grand jury can sit in judgment of wisdom of the policy behind a law, then the power to return a no bill in such cases is the clearest form of 'jury nullification.'"  408 F.3d at 1203 (footnote omitted).  "Furthermore, the grand jury has few tools for informing itself of the policy or legal justification for the law; it receives no briefs or arguments from the parties.   The grand jury has little but its own visceral reaction on which to judge the 'wisdom of the law.'"  <u>Id.</u>

Concerning the "United States Attorney and his Assistant United States Attorneys" instruction, the court stated:

> We also reject this final contention and hold that although this passage may include unnecessary language, it does not violate the Constitution.   The "candor, honesty, and good faith" language, when read in the context of the instructions as a whole, does not violate the constitutional relationship between the prosecutor and grand jury. . . .   The instructions balance the praise for the government's attorney by informing the grand jurors that some have criticized the grand jury as a "mere rubber stamp" to the prosecution and reminding them that the grand jury is "independent of the United States Attorney[.]"

408 F.3d at 1207. <u>Id.</u>  "The phrase is not vouching for the prosecutor, but is closer to advising the grand jury of the presumption of regularity and good faith that the branches of government ordinarily afford each other." <u>Id.</u>

22

1    Any instruction that Assistant United States Attorneys are duty-bound to present evidence that

2  cuts against returning an indictment is directly contradicted by United States v. Williams, 504 U.S. 36,

3  51-53 (1992) ("If the grand jury has no obligation to consider all 'substantial exculpatory' evidence, we

4  do not understand how the prosecutor can be said to have a binding obligation to present it."  (emphasis

5  added)); see also United States v. Haynes, 216 F.3d 789, 798 (9th Cir.  2000) (" . . . prosecutors have

6  no obligation to disclose 'substantial exculpatory evidence' to a grand jury."  (citing Williams).

7    However, the analysis does not stop there.  Prior to assuming his judicial duties, Judge Burns

8  was a member of the United States Attorney's Office, and made appearances in front of the federal

9  grand jury.  As such he was undoubtedly aware of the provisions in the United States Attorneys' Manual

10  ("USAM").[6/]  Specifically, it appears he is aware of USAM Section 9-11.233 thereof which reads:

11    In United States v. Williams, 112 S.Ct. 1735 (1992), the Supreme Court held that
12  the Federal courts' supervisory powers over the grand jury did not include the power to
make a rule allowing the dismissal of an otherwise valid indictment where the prosecutor
failed to introduce substantial exculpatory evidence to a grand jury. It is the policy of the
13  Department of Justice, however, that when a prosecutor conducting a grand jury inquiry
is personally aware of substantial evidence that directly negates the guilt of a subject of
14  the investigation, the prosecutor must present or otherwise disclose such evidence to the
grand jury before seeking an indictment against such a person. While a failure to follow
15  the Department's policy should not result in dismissal of an indictment, appellate courts
may refer violations of the policy to the Office of Professional Responsibility for review.

16  (Emphasis added.)[7/]  This policy was reconfirmed in USAM 9-5.001, Policy Regarding Disclosure of

17  Exculpatory and Impeachment Information, Paragraph "A," "this policy does not alter or supersede the

18  policy that requires prosecutors to disclose 'substantial evidence that directly negates the guilt of a

19  subject of the investigation' to the grand jury before seeking an indictment, see USAM § 9-11.233 ."

20  (Emphasis added.)[8/]

21

22    [6/]    The USAM is available on-line at www.usdoj.gov/usao/eousa/foia_reading_room/
usam/index.html.
23

24    [7/]  See www.usdoj.gov/usao/eousa/foia_reading_room/usam/ title9/11mcrm.htm. Even if Judge
Burns did not know of this provision in the USAM while he was a member of the United States
25  Attorney's Office, as the District Judge overseeing the grand jury, he could determine the required
duties of the United States Attorneys appearing before the grand jury from that source.

26    [8/]  See www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/5mcrm.htm. Similarly, this
new section does not bestow any procedural or substantive rights on defendants.
27

28    Under this policy, the government's disclosure will exceed its constitutional obligations.
This expanded disclosure policy, however, does not create a general right of discovery
in criminal cases. Nor does it provide defendants with any additional rights or remedies.

The fact that Judge Burns' statement contradicts <u>Williams</u>, but is in line with self-imposed guidelines for United States Attorneys, does not create the constitutional crisis proposed by Defendant. If "substantial" exculpatory evidence exists, as mandated by the USAM, the evidence should be presented to the grand jury by the Assistant U.S. Attorney upon pain of possibly having his or her career destroyed by an Office of Professional Responsibility investigation. There is nothing wrong with a grand juror inferring that there is no "substantial" exculpatory evidence, or even if some exculpatory evidence were presented, the evidence presented represents the universe of all available exculpatory evidence.

Further, just as the instruction language regarding the United States Attorney attacked in <u>Navarro-Vargas</u> was found to be "unnecessary language [which] does not violate the Constitution," 408 F.3d at 1207, so too the "duty-bound" statement was unnecessary when charging the grand jury concerning its relationship with the United States Attorney and her Assistant U.S. Attorneys, and does not violate the Constitution. In <u>United States v. Isgro</u>, 974 F.2d 1091 (9th Cir. 1992), the Ninth Circuit while reviewing <u>Williams</u> established that there is nothing in the Constitution which requires a prosecutor to give the person under investigation the right to present anything to the grand jury (including his or her testimony or other exculpatory evidence), and the absence of that information does not require dismissal of the indictment. 974 F.2d at 1096 ("<u>Williams</u> clearly rejects the idea that there exists a right to such 'fair' or 'objective' grand jury deliberations."). Therefore, while the "duty-bound" statement was an interesting tidbit of information, it was unnecessary in terms of advising the grand jurors of their rights and responsibilities, and does not render the instructions unconstitutional. The grand jurors were instructed by Judge Burns that, in essence, the United Sates Attorneys are "good guys," which was authorized by <u>Navarro-Vargas</u>. 408 F.3d at 1206-07 ("laudatory comments . . . not vouching for the prosecutor"). But he also repeatedly "remind[ed] the grand jury that it stands between the government and the accused and is independent," which was also required by <u>Navarro-Vargas</u>. 408 F.3d at 1207. In this context, the unnecessary "duty-bound" statement does not render the instructions constitutionally defective requiring dismissal of this Indictment.

---

USAM 9-5.001, ¶ "E." <u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/ 5mcrm.htm.

The "duty bound" statement does not indicate that the "'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant," and "[the] defendant can[not] show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed." <u>Isgro</u>, 974 F.2d at 1094 (citation omitted). Therefore, this Indictment, or any other indictment, need not be dismissed.

X

## DEFENDANT'S MOTION TO STRIKE THE TEMPORAL ALLEGATION SHOULD BE DENIED

Defendant requests that the Court strike the temporal allegation in the Indictment removal. However, the allegation is consistent with the requirements in <u>United States v. Salazar-Lopez</u>, 506 F.3d 748 (9th Cir. 2007). Thus, the temporal allegation should not be stricken.

XI

## DEFENDANT'S MOTION FOR LEAVE TO FILE FURTHER MOTIONS

Defendant's motion for leave to file further motions should be denied except to the extent that such motions are based on new discovery.

XII

## CONCLUSION

For the foregoing reasons, the United States asks that the Court deny Defendant's motions, except where unopposed, limit further motions to those based on new law or facts.

DATED: February 21, 2008                Respectfully submitted,

                                        KAREN P. HEWITT
                                        United States Attorney

                                        *s/Christopher M. Alexander*
                                        _____
                                        CHRISTOPHER M. ALEXANADER

                                        Assistant United States Attorney
                                        Attorneys for Plaintiff
                                        United States of America
                                        Email: Christopher.M.Alexander@usdoj.gov

25

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No.   07CR3470-BEN |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| JULIO BELTRAN-LAY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

IT IS HEREBY CERTIFIED THAT:

I, CHRISTOPHER ALEXANDER, am a citizen of the United States and am at least eighteen years of age.  My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action.  I have caused service of United States' Response to Defendant's Motions to (1) compel discovery/preserve evidence, (2) suppress various evidence, and (3) various grounds to dismiss the Indictment, together with statement of facts, memorandum of points and authorities on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

    1.    Timothy Scott, Esq.
          Atty for Defendant

I hereby certify that I have caused to be mailed the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

None

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 21, 2008.

*s/Christopher M. Alexander*

_____
CHRISTOPHER M. ALEXANDER